1

2

3

4

5

6

7                    **UNITED STATES DISTRICT COURT**

8                   **CENTRAL DISTRICT OF CALIFORNIA**

9

10  MICHAEL BURKS,                    )    NO. CV 03-07620 (Mc)
                                      )
11              Plaintiff,            )
                                      )    MEMORANDUM OF DECISION
12        v.                          )    AND ORDER IN A SOCIAL
                                      )    SECURITY CASE
13  JO ANNE B. BARNHART,              )
    Commissioner of the              )
14  Social Security Administration,   )
                                      )
15              Defendant.            )
    _____)

16

17       The plaintiff, MICHAEL BURKS, filed the present action for review

18  of a final determination of the Commissioner of Social Security (the

19  "Commissioner") that the plaintiff is not disabled and not entitled to

20  Supplemental Security Income ("SSI") disability benefits.  For the

21  reasons set forth below, the court finds that the decision of the

22  Commissioner is based upon substantial evidence.  The decision of the

23  Commissioner, therefore, is affirmed.

24                         **BACKGROUND**

25       The plaintiff protectively filed an application for SSI

26  disability benefits under the Social Security Act (the "Act") on

27  July 31, 1998.[1]  [Administrative Record ("AR") 40-42; 43.]  The

28

_____

[1] A prior application filed in 1992 is not at issue.  [AR 15.]

Commissioner denied the application initially and on reconsideration.[2]
[AR 28-31.]  At the plaintiff's request, an administrative hearing was
held before Administrative Law Judge David Wurzel on January 11, 2000.
[AR 400-64.]  On June 28, 2000, ALJ Wurzel filed a decision concluding
that the plaintiff was not under a disability as defined in the Act at
any time through the date of the decision.  [AR 158-67.]  The Appeals
Council granted review and remanded the matter.  [AR 175-78.]  A
second hearing and a supplemental hearing were held before
Administrative Law Judge Samuel W. Warner (the "ALJ") on November 29,
2001, and April 3, 2003.  [AR 467-501; 504-34.]  On May 21, 2003, the
ALJ again found the plaintiff to be "not disabled."  [AR 15-25.]  The
Appeals Council denied the plaintiff's request for review of the ALJ's
decision.  [AR 7-10.]  The decision of the ALJ stands as the final
decision of the Commissioner.

     Thereafter, the plaintiff filed the present action.  The
plaintiff and the Commissioner have consented to proceed before a
United States Magistrate Judge.  The parties have entered into a Joint
Stipulation setting forth their arguments.

**STANDARDS OF REVIEW**

     The court must sustain the findings of the Commissioner unless:
(a) they are not supported by substantial evidence in the record as a
whole; or (b) the Commissioner applied an improper legal standard.
See 42 U.S.C. 405(g); Gordon v. Secretary of Health and Human
Services, 803 F.2d 1071, 1072 (9th Cir. 1986).  Substantial evidence
means "more than a mere scintilla" but less than a preponderance.

---

     [2] The Notice of Reconsideration is not in the administrative
record.

1  <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28

2  L.Ed.2d 842 (1971); <u>Desrosiers v. Secretary of Health and Human</u>

3  <u>Services</u>, 846 F.2d 573, 576 (9th Cir. 1988).  "Substantial evidence"

4  is evidence a "reasonable mind might accept as adequate to support a

5  conclusion."  <u>Richardson v. Perales</u>, 402 U.S. at 402; <u>Gordon v.</u>

6  <u>Secretary of Health and Human Services</u>, 803 F.2d at 1072.

7  　　　This court must review the record as a whole and consider adverse

8  as well as supporting evidence.  See <u>Green v. Heckler</u>, 803 F.2d 528,

9  529-30 (9th Cir. 1986).  Where evidence is susceptible of more than

10 one rational interpretation, the court must sustain the Commissioner's

11 decision.  See <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1453 (9th Cir.

12 1984).

13 　　　　　　　　**THE FIVE-STEP SEQUENTIAL EVALUATION**

14 　　　The Commissioner has established a five-step sequential

15 evaluation for determining whether a person is disabled.  First, the

16 Commissioner determines whether the person is engaged in "substantial

17 gainful activity."  If so, the Commissioner denies disability

18 benefits.  Second, if the person is not so engaged, the Commissioner

19 determines whether the person has a medically severe impairment or

20 combination of impairments.  If the person does not have a severe

21 impairment or combination of impairments, the Commissioner denies

22 benefits.  Third, if the person has a severe impairment, the

23 Commissioner determines whether the impairment meets or equals one of

24 a number of "listed impairments."  If the impairment meets or equals a

25 "listed impairment," the Commissioner conclusively presumes that the

26 person is disabled.  Fourth, if the impairment does not meet or equal

27 the "listed impairments," the Commissioner determines whether the

28 impairment prevents the person from performing past relevant work.  If

the person can perform past relevant work, the Commissioner denies benefits.   Fifth, if the person cannot perform past relevant work, the burden shifts to the Commissioner to show that the person is able to perform other kinds of work.   The person is entitled to disability benefits only if he or she is unable to perform other work.   See 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 96 L.Ed 119 (1987).

## FINDINGS OF THE ALJ

The plaintiff was born June 16, 1953.  [AR 40.]  The plaintiff has an eleventh grade education [AR 16, 57] and no vocationally relevant past work [AR 16].   The plaintiff alleges that he has been unable to work since August 1, 1995, because of depression and loss of memory.  [AR 53.]

The ALJ found that the plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.  [AR 24.]  The ALJ found that the plaintiff had medically determinable impairments consisting of depression, irritability, anger, and mood swings.  The ALJ found that the plaintiff's impairments were severe but that the plaintiff did not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P, Regulations No. 4.  [AR 21, 24.]  The ALJ found that the plaintiff was not credible and that the plaintiff retained the residual functional capacity to perform simple, repetitive, low mental stress work requiring simple one to two step instructions with limited ability to relate and interact with the public, supervisors and co-workers.  The ALJ found no exertional limitations.  Based upon the plaintiff's age, education, vocational background, and "[c]onsidering the range of work at all levels that the claimant is still functionally capable of

- 4 -

1  performing," using section 204.00 of the Medical-Vocational Guidelines

2  as a framework for decision-making, the ALJ found that the plaintiff

3  was not disabled.  The ALJ found that there were a significant number

4  of jobs in the national economy which the plaintiff could still

5  perform such as that of icer, vehicle cleaner, and advertising

6  distributer.  Accordingly, the ALJ concluded that the plaintiff was

7  not under a disability as defined in the Act at any time through the

8  date of the decision.  [AR 24.]

9  **THE PLAINTIFF'S CONTENTIONS**

10  The plaintiff contends that the ALJ's residual functional

11  capacity is not based upon substantial evidence.  The plaintiff

12  charges that in arriving at his residual functional capacity

13  determination, the ALJ improperly disregarded the opinions of the

14  plaintiff's treating physicians.  The plaintiff further contends that

15  the ALJ failed to pose a complete hypothetical question to the

16  vocational expert ("VE").

17  **DISCUSSION**

18  **The treating physicians' opinions**

19  The opinion of a treating physician is generally entitled to

20  greater weight than the opinions of a physician who has examined, but

21  not treated the claimant.  This is so because the treating physician

22  is employed to cure and has a greater opportunity to know and observe

23  his patient than a physician who only saw the claimant on one

24  occasion.  The opinion of an examining physician, in turn, is

25  generally entitled to greater weight than the opinions of a physician

26  who has not examined the claimant.  Andrews v. Shalala, 53 F.3d 1035,

27  1041 (9th Cir. 1995).  This is not to say, however, that the opinion

28  of even a treating physician is "necessarily conclusive as to either a

physical condition or the ultimate issue of disability." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989), citing Rodriguez v. Bowen, 876 F.2d 759, 761-62 & n. 7 (9th Cir. 1989).  If, for example, the opinion of a treating physician is rejected in favor of that of a non-treating physician, and the opinion of the non-treating physician is based upon independent clinical findings, the opinion of the non-treating physician can constitute substantial evidence.  It is then for the ALJ to resolve the conflict.  Andrews, 53 F. 3d at 1041.  If, on the other hand, the opinion of the non-treating physician is based upon the same clinical findings considered by the treating physician, the ALJ must cite specific and legitimate reasons for rejecting the treating physician's opinion.  Id.

The plaintiff contends that the treatment records from the Department of Mental Health, South Bay Mental Health, Dr. Buford Gibson, West Central Mental Health and Clinical Circle "demonstrate the existence of a more severe impairment than found by the ALJ." [Joint Stipulation at 4.]  The plaintiff relies primarily upon the opinions of Dr. Gibson and Dr. Udo Wogu of the Clinical Circle, whose opinions, if given credence, would, according to the VE, preclude work.  [Id., see AR 499; AR 310, 314.]  The plaintiff argues that the ALJ erred in relying instead upon the opinion of the consultative examiners and the medical expert, Dr. Franklin Drucker.

///
///
///
///
///
///

- 6 -

1   <u>Department of Mental Health</u>[3]

2   _____The Department of Corrections records indicate that in early

3   1996, shortly before his release from the state prison system, the

4   plaintiff denied physical or mental problems [AR 219], and the

5   plaintiff was assessed to have no psychiatric illness or current

6   medical problems.  [AR 220.]  Not long after his release, in October,

7   1996, the plaintiff sought treatment at the Los Angeles County

8   Department of Mental Health.  When first seen by the Department of

9   Mental Health, no significant abnormalities were noted.  The plaintiff

10  was neatly and casually dressed, and he was friendly and talkative.

11  The plaintiff reported, contrary to his testimony [AR 428-30], that he

12  was working on and off as a mechanic and that he enjoyed his work [AR

13  100; <u>see also</u> AR at 77].  The plaintiff also reported that he read,

14  and he enjoyed being with his seven-year old nephew.  [AR 100.]  The

15  plaintiff's only complaints at that time were headaches, buzzing

16  noises, and regrets about his life.  [<u>Id.</u>]  Nevertheless, the

17  plaintiff was planning to apply for S.S.I., and he was cautioned about

18  symptom exaggeration.  In completing a form PA1, the plaintiff worked

19  at an average pace and demonstrated fair reading ability, although he

20  was suspicious of the process.  [AR 98.]  However, the plaintiff

21  missed his subsequent appointments, and it was determined that the

22  plaintiff was not "in dire need of meds and case will be closed."  He

23  was referred back to the Parole Office.  [AR 99.]

24

25  _____

     [3] Although the plaintiff identifies records of the Department of
26  Mental Health, South Bay Mental Health and West Central Mental Health
     [Joint Stipulation at 4] individually, they are all facilities of the
27  Los Angeles County Department of Mental Health.  The facility
     identified by the plaintiff as the "Department of Mental Health" also
28  appears to be the South Bay facility.  [AR 88-100; <u>see</u> AR 402, 448.]

The plaintiff returned approximately two years later in September, 1998.  An initial assessment was performed.  The plaintiff again complained of headaches and regrets about his life.  He reported that he had crying spells and that he had a lot of anger and difficulty getting along with others.  [AR 91.]  However, he was friendly with his cousin, had a girlfriend, and he enjoyed being with her two children.  [AR 93.]  Mental status examination revealed that speech was excessive, and mood was tearful and irritable, but he constantly smiled.  The plaintiff also reported that he saw things out of the corner of his eye, and he heard buzzing noises.  Associations were circumstantial, and insight was moderately impaired.  He was always watchful, and behavior was aggressive, violent/destructive with excessive or inappropriate displays of anger.  He was antisocial, and he reported suicidal or homicidal ideation.  The plaintiff reported that he was more hostile without medication.  Sleep was reported to be poor, but appetite was "okay."  Otherwise, grooming and hygiene were normal, eye contact was normal, the plaintiff was calm, he was fully oriented, intellectual functioning was unimpaired, memory was unimpaired, affect was appropriate, concentration was intact, serial 7's were intact, and judgment was intact.  [AR 94.]

The evaluating clinician noted that, although the plaintiff had not worked in years, the plaintiff might be able to work.  The clinician recommended that the plaintiff might be a candidate for rehabilitation.  The plaintiff was to undergo a medical evaluation.  [AR 95.]  There is no record of further treatment at that time.

The plaintiff argues that the plaintiff's tearfulness and irritability, hallucinations, impaired insight and his self-reported behavior indicates a greater degree of mental impairment than as found

by the ALJ.  However, there is no dispute that the plaintiff suffers from depression, irritability, anger, and mood swings, but the only "hallucinations" reported were seeing things out of the corner of his eye and hearing buzzing noises, and despite the plaintiff's reported aggressive behavior, mental status examination revealed that he was calm and cooperative with unimpaired memory and concentration, and, as noted by the ALJ, the evaluating clinician did not conclude that the plaintiff was not able to work.  [AR 17; see AR 95.]

Nothing in these records suggest greater limitations than as found by the ALJ.[4]

South Bay Mental Health

The plaintiff returned to treatment in May, 1999, this time at the South Bay Mental Health (Los Angeles County Department of Mental Health).  In June, 1999, the plaintiff underwent psychological testing "to clarify his diagnosis and evaluate factors which may affect his treatment, and to supply information for an SSI evaluation."  At that time, the plaintiff again complained of physical problems and headaches and poor anger control with a history of arrests for fighting.[5]  Test validity revealed "no clear indications of

---

[4] The plaintiff was also seen by Dr. Gustavo Vintas for a consultative psychiatric examination in October, 1998.  At that time, the plaintiff complained of being fearful that others would harm him or that he would harm others.  The plaintiff reported depression, anxiety, headaches and hearing voices.  [AR 101; compare AR 94.]  Dr. Vintas concluded that the plaintiff could follow simple instructions. [AR 103.]

[5] Although the plaintiff testified to a "domestic-type arrest" [AR 434], the plaintiff's actual convictions and incarcerations were for "transport, sales . . . [o]f cocaine, controlled substance" [AR 425; see AR 102], petty theft [AR 432-33], and grand theft [AR 433]. The plaintiff also had a misdemeanor conviction for drunk driving. [AR 434.]

malingering," and no indication of symptom exaggeration.  However, because of inconsistent responses to similar items which might be attributable to hasty responding or poor attention, the test results should be interpreted with caution.

Testing of attention and concentration revealed deficits with an unusual combination of low accuracy and slow speed.  Even so, "simple attention is intact," although the plaintiff was judged to be "impaired with more complex and sustained attention."  [AR 131.]  The plaintiff's test results also suggested "diffuse brain dysfunction which has a frontal lobe component.  Executive functioning, such as the ability to plan, initiate and carry out the plan in an organized fashion, monitor his performance for mistakes, and correct mistakes, is expected to be poor."  Memory testing revealed borderline impairment of delayed verbal memory, and the plaintiff was "expected to have difficulty retaining instructions."  [AR 130.]

This testing also indicated that the primary Axis I features appeared to be somatic concerns, affective instability, and poor anger control.  An organic cause for some of the plaintiff's physical symptoms must be considered.  There was no indication of substantial depression, psychosis or mania.  However, there were less severe indications of depression consistent with dysthymia.  Axis II features were significant for anti-social traits.  However, his anger appeared "to be fairly well controlled most of the time, but may erupt unexpectedly and take the form of physical violence."  Oppositional traits would also make it difficult for the plaintiff to take instruction from others.  [Id.]

Testing also revealed that the plaintiff might be more resistant to treatment than others.  The plaintiff's "concern with SSI and

- 10 -

getting appropriate treatment for his physical symptoms are probably the primary reason he has remained in treatment."  The clinician reiterated that malingering is unlikely, but "this possibility has not been completely ruled out. . . . The fact that the low cognitive scores occurred in the context of a pending SSI examination should not be ignored."  [AR 129.]

Treatment records indicated that the plaintiff was not always compliant with the medication [AR 121, 123, 128] and that he failed several appointments [AR 123, 127, 128].  Medication, however, was beneficial.  [AR 127.]  In fact, the plaintiff indicated that he liked his medication "and the way it [made] him feel–no side effects."  [AR 123.]

The plaintiff decided to transfer his care to West Central Mental Health in December, 1999, because it was closer to his home.  [AR 121, 122.]

In summary, the psychological testing revealed that the plaintiff suffered from somatic concerns, affective instability and poor anger control.  However, there was no indication of significant depression, psychosis, or mania, although there was evidence of dysthymia, a less severe indication of depression.  This testing also suggested a greater degree of cognitive dysfunction than previously indicated. Malingering, though unlikely, was not ruled out, and the plaintiff's concern over S.S.I. and treatment for physical complaints were probably the primary reasons for the plaintiff remaining in treatment. Even considering the cognitive dysfunction indicated by the testing, "simple attention" remained intact.  The plaintiff's anger was pretty well-controlled, although it might erupt, but when the plaintiff took his medications regularly, he had a good response.

These records, therefore, do not contradict the ALJ's finding that the plaintiff retained the residual functional capacity to perform simple, repetitive, low mental stress work requiring simple one to two step instructions with limited ability to relate and interact with the public, supervisors and co-workers.

West Central Mental Health

The plaintiff first went to West Central in January, 2000, expressing a desire to control his temper [AR 395; AR 299; see AR 297].  The initial assessment indicated a diagnosis of major depressive disorder, recurrent, moderate, with a GAF of 42,[6] but the prognosis was fair once the plaintiff was stable on medication.  [AR 297.]  Mental status examination at that time revealed that the plaintiff was aggressive and isolated/withdrawn.  Concentration was reported to be impaired, with an indication that the plaintiff could not concentrate for a long time.  Otherwise, the results of the examination were essentially normal.  Grooming and hygiene were average, eye contact was normal, and despite contrary indications of aggressiveness, the plaintiff was calm.  Intellectual functioning was unimpaired, although memory "fade[d] in and out." No mood disorder was evident, and the plaintiff reported that he liked to box and go to the shooting range.  Affect was appropriate, no perceptual disturbances were apparent, associations were unimpaired, judgment was intact, and

---

[6] Global Assessment of Functioning.  The GAF scale reports a "clinician's judgment of the individual's overall level of functioning" which is used in "planning treatment and measuring its impact, and in predicting outcome."  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id., at 34.

1  insight was adequate.  No disturbance of thought content was apparent,

2  and suicidal/homicidal ideation were denied.  [AR 296.]  In April,

3  2000, the plaintiff was "stable on Depakote," but a medication

4  evaluation was pending.  [AR 305.]  The plaintiff continued to

5  complain during treatment of anger and overreaction as well as

6  depression.  [AR 302, 304.]  However, the plaintiff again failed

7  appointments [AR 303, 305], and there is no record of further visits

8  after the winter of 2000 [AR 303.]  Accordingly, the plaintiff was

9  discharged from treatment in August, 2001.  [AR 292.]

10      During this time period, the plaintiff's therapist, Darrin

11  Johnson, MSW, wrote two letters in the plaintiff's behalf, but neither

12  indicated that the plaintiff was disabled or unable to work or that

13  the plaintiff had any particular limitations.  [AR 306, 307.]

14      In the meantime, the plaintiff reportedly switched his care to

15  Dr. Buford Gibson and the Clinical Circle in approximately March,

16  2001.  [AR 312; see AR 332.]

17      However, the plaintiff returned to the West Central clinic on

18  November 28, 2001, after a year's absence "because he moved to NYC.

19  Just returned to LA in time before the World Trade collapse."  The

20  plaintiff stated that he had been taking his medications but ran out.

21  "He asserts that he felt much better while taking them regularly."

22  [AR 386.]  When he saw Mr. Johnson in December, 2001, the plaintiff

23  reported that he had been "doing much better, e.g., sleeping better,

24  appetite better, feels calmer.  Client shared that he will be helping

25  his sister at her duplex."  [AR 386.]  Mr. Johnson's observations also

26  indicated that the plaintiff was cooperative, lucid, calm and

27  appropriate.  [Id.]

28  ///

- 13 -

The plaintiff continued his treatment at West Central Mental Health, albeit somewhat sporadically, and on April 30, 2003, an Evaluation Form for Mental Disorders was completed by Mr. Johnson and Dr. Thaworn Rathana-Nakintara, the staff psychiatrist.  This assessment indicated a very severe impairment.  It indicated that the plaintiff had poor memory and severe inability to concentrate.  Thinking was said to be "cloudy."  Weight and appetite were described as fluctuating.  Sleep patterns were reported to be irregular with insomnia.  The plaintiff was reported to have frequent suicidal ideation, decreased energy, feelings of hopelessness, worthlessness, and "fear induced increase in heart rate 'for no rational reason.'"  [AR 361.]  The plaintiff also reported severe auditory hallucinations.  The plaintiff's daily activities were said to be severely curtailed.  The plaintiff was reported to be unable to perform daily living activities such as grooming, paying bills, cleaning house, or even preparing meals when he was having a depressive episode or was actively hallucinating "which can occur on any given day."  The plaintiff was also described as having post traumatic stress disorder symptoms which "impede his sleeping dramatically, 2 to 3 hours a night," which in turn impaired the plaintiff's concentration.  [AR 362.]  The plaintiff was also said to have such a poor memory that he was unable to keep his appointments without a reminder, and his "temper, rage, and paranoia all prohibit him from being around others for any prolonged period of time, and would be harmful for those whom he would interact.  Client's extreme nature of angry thoughts towards

///

///

///

- 14 -

1  others makes it unsafe for him and others to be in a work

2  environment."  The assessed GAF was 37.[7]  [AR 363.]

3  _____The ALJ rejected this assessment because it "exclude[d] the

4  claimant's reports of significant improvement with medications."  [AR

5  22.]  In this connection, just five days prior to the April 30, 2003,

6  Evaluation Form, Dr. Rathana-Nakintara indicated that the plaintiff,

7  who had been taking more than the prescribed amount, was "feeling much

8  better.  No side effects.  Will renew both meds accordingly.  Sleeping

9  so well and not hallucinated nor paranoid, while taking Zyprexa 20 mg.

10 at bedtime.  Much less depressed, while taking Zoloft 200 mg. daily."

11 Return appointment was scheduled for three months.  [AR 365.]  The

12 previous entry likewise did not conform to the description of such a

13 severely impaired individual as pictured in the Evaluation Form.  On

14 January 17, 2003, the plaintiff was "[l]ooking well. . . .  No longer

15 depressed while taking Zoloft 100 mg. daily.  Feeling calm and settled

16 down with less impulsively reactive to others, while taking Zyprexa 10

17 mg. daily.  Not hallucinated nor paranoid, but would hit back if

18 someone attacks him.  No side effects.  Has not got involved with the

19 police re: assault since last visit 3 months ago.  Alert, calm and

20 appropriate."  [AR 366.]

21    At the time of the previous visit of September 20, 2002, the

22 plaintiff was on time.  He returned to the clinic after more than five

23 months of absence, "during which he had obtaining [sic] the same

24

25 _____

26    [7] A GAF of 31-40 indicates "[s]ome impairment in reality testing
   or communication (e.g., speech is at times illogical, obscure, or
27 irrelevant) OR major impairment in several areas, such as work or
   school, family relations, judgment, thinking, or mood (e.g., depressed
28 man avoids friends, neglects family, and is unable to work. . . .)"

refills at the local MHC in San Bernardino,[8] where he had lived with the sister. . . . No side effects.  Not hallucinated as long as he takes Zyprexa 10 mg. daily and not depressed with Zoloft 100 mg. Alert, calm and appropriate."  [AR 368.]

_____In May, 2002, the plaintiff returned to the clinic after a four month absence in order to obtain medication refills.  [AR 372.]  He had not taken the medications in about a week.  [AR 371.]  The plaintiff complained that the had been "feeling kinda down."  [AR 371.]  Nevertheless, the plaintiff had been "taking care of his very ill sister."  [AR 372.]  He felt that Depakote did not work as well. The plaintiff recalled that he had felt "much better" while on Zyprexa and Zoloft "(not hallucinated and not depressed respectively)."  [AR 372.]  The plaintiff claimed, however, that he heard voices occasionally, and he felt tired and sluggish.  However, he denied being suicidal.  [AR 371.]  The plaintiff presented as alert and oriented times three.  Speech was clear, and verbal and behavioral responses were appropriate.  [AR 371, 372.]

    Thus, the record is replete with references to the efficacy of Zoloft and Zyprexa in controlling the plaintiff's hallucinations and depression.  The treatment notes also do not confirm the findings in the Evaluation Form that the plaintiff was frequently suicidal, that he had severe auditory hallucinations, that his thinking was not lucid, that he was unable essentially to care for himself when he was reported to have been taking care of his very ill sister.  In noting the conflict between the opinions of disability on the Evaluation Form

---

[8] There are no records from any mental health clinic in San Bernardino.

and the treatment record which indicated significant improvement with medication, the ALJ provided sufficiently specific and legitimate reasons supported by substantial evidence in the record for rejecting the opinion of Dr. Rathana-Nakintara.  See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003)(finding that the ALJ properly found that the treating physician's "extensive conclusions" regarding the claimant's limitations were not supported by his own treatment notes).

Dr. Buford Gibson

Dr. Gibson apparently first saw the plaintiff in March, 2001. Plaintiff reportedly had complaints of depression, sleeplessness, fluctuating appetite, hopelessness, worthlessness, inability to care for things at home, inability to work, tearfulness and suicidal ideation, and fear that he may hurt someone or get in trouble with authority figures.  Dr. Gibson also reported a history of continuing mood swings from hypomania to mania to depression.  [AR 318.]  Dr. Gibson wrote that the plaintiff had "a disorder characterized by elevated mood swings.  There are distinct periods of abnormality and persistently elevated, expansive, or irritable mood."  Dr. Gibson listed inflated self-esteem or grandiosity, decreased need for sleep, more talkative than usual or pressure to keep talking, flight of ideas, distractibility, psychomotor agitation, and excessive involvement in high risk pleasurable activities such a spending splurges.  Dr. Gibson opined in an undated report that the plaintiff's mood swings were sufficiently severe to cause marked impairment in occupational, social, and educational functioning.  [AR 319; see also AR 286.]  Dr. Gibson reported that the plaintiff had repeated

///

///

difficulty keeping a job due to the mood swings and periods of anger and hostility with authority figures.[9]   Therefore, according to Dr. Gibson, the plaintiff "has been repeatedly unable to keep a job and/or unable to do the work."  [AR 319.]  Dr. Gibson's mental status examination revealed that there was "some lack of self care" in the plaintiff's appearance.   Mood was depressed and ideation was depressive.  Dr. Gibson reported that the plaintiff was suicidal but without a plan, that the plaintiff was homicidal with a history of many fights and fears he may hurt someone, that the plaintiff suffered from delusions in that the plaintiff gets up several times at night to check the locks and doors and that the plaintiff occasionally heard derogatory voices, that memory was impaired, that concentration was impaired in that the plaintiff failed serial 7's and was unable to spell "world" backwards, that insight was decreased and that judgment was impaired.  [AR 320.]  In November, 2001, Dr. Gibson completed a Mental Impairment Questionnaire.  Signs and symptoms included poor memory, sleep disturbance, mood disturbance, emotional lability, social withdrawal or isolation, blunt, flat or inappropriate affect, decreased energy and manic syndrome, anhedonia, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation, hostility and irritability.  [AR 312-13.]

///

_____

[9] The plaintiff, on the other hand, testified that he left his last job because he got ill due to back problems, and he had dental problems.  [AR 409.]  He left the previous job at the Southern California Rapid Transit because of the back injury for which he filed a workers' compensation case.  [AR 410.]  He testified that he left his job with the Salvation Army because of problems with his legs and because the Salvation Army relocated.  [AR 412, 414.]

However, somewhat inconsistently, Dr. Gibson also reported that there was no indication of appetite disturbance, loss of intellectual ability, delusions or hallucinations, panic attacks, oddities of thought, perception, speech or behavior, illogical thinking or loosening of associations, paranoia, persistent irrational fears, generalized persistent anxiety, or somatization.[10]   [Id.; compare AR 320.]   Prognosis was guarded but "good if meds are effective in yielding some stabilization."   [AR 314.]

Dr. Gibson assessed that the plaintiff would be absent more than three days a month due to his psychiatric impairment or treatment, and essentially, he reiterated that the plaintiff could not work [AR 314, 315], indicating that the plaintiff had marked restriction of activities of daily living, marked difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and

///

///

///

---

[10] At the first hearing in January, 2000, when the plaintiff was asked why he could not work, the plaintiff answered that he had "a hard time a lot of times controlling [his] anger," and that "it takes all [he has] to keep from wanting to hurt people a lot of times."   [AR 435.]   When asked if there were other reasons why he could not work, the plaintiff generally focused upon physical complaints which are not at issue.   [AR 435-42.]   Upon examination by his counsel, the plaintiff indicated that in addition to anger issues, the plaintiff suffered from bouts of depression, and moderate concentration difficulties, indicating that he had difficulty remembering what he had read once he puts the book down.   [AR 454, 455.]   There was no testimony about delusions, hallucinations, suicidal ideation, manic syndrome, grandiosity, sleep disturbance, energy disturbance, or even significant anhedonia.   The plaintiff's testimony at the second and third (supplemental) hearings likewise failed to disclose such symptom complaints.

repeated episodes of deterioration or decompensation in work or work-like settings.[11]  [AR 315.]

In the meantime, in November, 2002, the plaintiff was seen for a second consultative psychiatric examination with Dr. Norma Aguilar. Dr. Aguilar reported that the plaintiff was alert, with normal eye contact and fair grooming and hygiene.  The plaintiff was cooperative but guarded, and behavior was appropriate.  Motor activity was normal, and speech was normal, spontaneous, rational and coherent.  [AR 338.] The plaintiff complained of extreme anger, depression, and a history of past attempts by putting a gun into his mouth.  However, the plaintiff denied any suicidal thoughts at present.  The plaintiff did, on the other hand, report a desire to hurt two of his neighbors. The plaintiff also stated that he had been hearing voices for a long time, and he had visions of shadows.  However, he denied any current visual hallucinations, although he still reported hearing voices.  The plaintiff denied paranoia or delusions.  The plaintiff reported improvement with his treatment.  "He feels less depressed and feels much better with Zyprexa.  He states that without the Zyprexa, he feels angry and has crying spells.  The plaintiff also reported that the group therapy at Clinical Circle helped him.  [AR 337.]

Examination of the plaintiff's intellectual functioning and sensorium revealed that digit span was three digits forward and one

---

[11] On the other hand, the treatment record from West Central in December, 2001, approximately one month after Dr. Gibson completed the Mental Impairment Questionnaire, indicated that the plaintiff reported that he had been "doing much better, e.g., sleeping better, appetite better, feels calmer," and the plaintiff told his therapist that he would be "helping his sister at her duplex."  [AR 386.]  The therapist observed that the plaintiff was cooperative, lucid, calm and appropriate.  [Id.]

backward.  The plaintiff was able to recall three out of three objects immediately, and two of three after five minutes.  However, the plaintiff was able to perform serial sevens rapidly and accurately.  Mood was slightly dysphoric, and affect was constricted.  Sleep and appetite were reported as fair.  The plaintiff complained of occasional anxiety.  Although the plaintiff complained of auditory hallucinations, he denied delusions or confusion.  There was no disorganized thinking noted nor looseness of associations.  The plaintiff denied mood swings.

Dr. Aguilar reported that the plaintiff needed no assistance with grooming and hygiene, and that he took a bath nearly every day.  The plaintiff watched television for twenty minutes, and he read for ten minutes each day.  The plaintiff could cook, shop for his needs, maintain his residence, and use public transportation.  The plaintiff communicates and interacts with family and friends.  [AR 338.]  Dr. Aguilar assessed that the plaintiff had the ability to follow and understand simple and complex instructions.  Dr. Aguilar assessed that the plaintiff would have mild difficulty interacting with supervisors, co-workers and the public.  He would have mild difficulty complying with job rules such as safety and attendance, and he would have mild to moderate difficulty responding to changes in the normal work setting.  Difficulty maintaining persistence and pace in a normal work setting would also be mild to moderate.  [AR 339.]

Dr. Gibson, however, reiterated in March, 2003, that the plaintiff was "totally disabled and unable to do former work or any work."  [AR 346.]  Dr. Gibson reported that mood was depressed, that the plaintiff evidenced "some lack of self care in his appearance,"
///

that the plaintiff had suicidal ideation, delusions, and impaired concentration, memory, insight and judgment.[12]   [AR 345.]

Thus, Dr. Gibson's opinion is in sharp contrast with the opinion of Dr. Aguilar.  However, it is not just the opinion concerning the degree of functional limitations that differ but the clinical findings as well.  Dr Gibson indicated that the plaintiff had suicidal ideation.  Dr. Aguilar reported that the plaintiff denied current suicidal thoughts.  Dr. Gibson reported that the plaintiff suffered from delusions.  Dr. Aguilar indicated that the plaintiff denied delusions.  Dr. Gibson reported impaired concentration.  Dr. Aguilar reported some impairment, but she also noted that serial seven's were performed rapidly and accurately.  Where the opinions of a non-treating physician are based upon independent clinical findings, as is the case with Dr. Aguilar, the opinion of the non-treating physician can constitute substantial evidence, and it is for the ALJ to resolve the conflict.  Andrews, 53 F.3d at 1041.

Moreover, in rejecting the opinion of Dr. Gibson, the ALJ also provided sufficiently specific and legitimate reasons based upon substantial evidence.

The ALJ indicated that "Dr. Gibson examined the claimant four times over a three-year period but appears has not actually provided any treatment to the claimant and also neglected to review the claimant's past medical records."[13]   [AR 22.]   The ALJ also found that

---

[12] Compare AR 365-66.

[13] The plaintiff, however, contends that he received treatment from Dr. Gibson.  [AR 506, 508.]  Nevertheless, the plaintiff does not now dispute the ALJ's finding concerning the number of times the plaintiff was seen by Dr. Gibson, and it is not at all clear that the treatment was for the more than two years suggested by Dr. Gibson's

1   the treatment record did not support Dr. Gibson's assessment.   [AR

2   22.]   These records from the West Central Clinic, as noted by the ALJ,

3   indicated that the plaintiff's depression was well controlled when the

4   plaintiff was compliant with his medication.   "Many times [the

5   plaintiff] praised the effectiveness" of his medications.   [Id.; see

6   AR 123.]   Even Dr. Gibson noted that prognosis was good once the

7   plaintiff's condition was stabilized with medication.   [AR 314.]

8        The treatment record is also inconsistent with Dr. Gibson's

9   findings of suicidal and homicidal ideation [see AR 371; see also AR

10  366], sleep disturbance [see AR 365], hallucinations [see AR 365, 366;

11  see also AR 308], and lack of self care [see AR 366].   Dr. Gibson's

12  own sparse treatment notes of February and March, 2003, reveal little

13  other than the treatment issues which related primarily to anger

14  management, conflict with others, depression and withdrawal.   [AR 352,

15  357.]   There is little in the way of clinical findings or

16  observations.

17  Dr. Wogu and the Clinical Circle

18       Like Dr. Gibson, Dr. Wogu of the Clinical Circle also first saw

19  the plaintiff in March, 2001.   [AR 287.]   According to Dr. Wogu, he

20  had seen the plaintiff on a weekly basis.   [AR 308.]   However, as

21  noted by the ALJ, Dr. Wogu's various reports are unaccompanied by any

22  treatment notes.   [AR 21; see AR 490.]

23

24  reports or that the treatment was regular and ongoing until shortly
    before the last and supplemental hearing in 2003.   [AR 351-52; see
25  also AR and AR 490.]   The only treatment records submitted from Dr.
    Gibson cover the period of February and March, 2003.   [AR 351-52,
26  357.]   During this period, the plaintiff apparently was also receiving
    simultaneous treatment at West Central Mental Health, and perhaps at
27  the Clinical Circle as well.   [AR 365, 366; see also 308, 332.]
    However, the plaintiff's medication was apparently prescribed by Dr.
28  Rathana-Nakintara at the West Central Clinic.   [AR 507.]

In November, 2001, Dr. Wogu, like Dr. Gibson, also completed a Mental Impairment Questionnaire.  The signs and symptoms cited by Dr. Wogu are virtually identical to those listed by Dr. Gibson, except that Dr. Wogu also noted paranoia or inappropriate suspiciousness.  [Compare AR 308-09 with 312-13.]  Dr. Wogu also indicated that the plaintiff would be absent more than three days a month and that the plaintiff essentially could not work.  [AR 310-11.]  Curiously, however, despite the suggestion that the plaintiff received one-to-one psychotherapy on a weekly basis [AR 308], Dr. Wogu indicated under "Treatment and Response" that the plaintiff was referred to a specialist [AR 309], and Dr. Wogu did not complete the section of the questionnaire which called for the DSM IV multiaxial evaluation.  Instead, Dr. Wogu indicated that this was "deferred."  [AR 308.]

In the meantime, on September 18, 2002, Dr. Jacqueline Barry, also of the Clinical Circle, wrote that the plaintiff was chronically disabled and unable to work.  [AR 335.]  Dr. Barry also reported that treatment objectives would only be marginally successful because of the limits of pharmacological benefit, indicating that the only benefit derived was that the plaintiff's suicidal ideation and potential substance abuse has been controlled.  However, according to Dr. Barry, the medication "had not been able to alleviate the chronic and intense nature of the mood swings."[14]  [AR 334.]  Dr. Barry also indicated that psychotherapy had its limits as well, due to the plaintiff's limited ability to trust and participate in a therapeutic

---

[14] Compare AR 368.  The plaintiff reported to West Central that he did not hallucinate as long as he took his Zyprexa, and he was not depressed as long as he took his Zoloft.  The plaintiff was "[a]lert, calm and appropriate."

1  relationship, "therefore limiting possible clinical gains."  [AR 335;

2  compare, however, AR 385.]

3       In any case, the ALJ rejected the assessments of Dr. Barry and

4  Dr. Wogu.  First, the ALJ noted the lack of supportive office notes.

5  [AR 21.]  Absent such notes, the ALJ found that it was not clear that

6  Dr. Barry ever treated the plaintiff.  Furthermore, the ALJ found that

7  the findings of the Clinical Circle, like those of Dr. Gibson, were

8  not supported by the treatment records.  Again, the ALJ noted that the

9  treatment records (from West Central) did not indicate that the

10 plaintiff suffered from bipolar disorder, and he noted that Dr.

11 Barry's assessment that the plaintiff's "medications have offered

12 limited benefits are contradictory to the treating records.  Evidence

13 shows the claimant had reported two days earlier how well the same

14 medications work for him."  [AR 22; see AR 368.]

15      Last, the ALJ found that all of the above physicians' reports

16 were premised on the plaintiff's "grossly inconsistent and perhaps

17 manipulative statements," and that, accordingly, their opinions were

18 less persuasive.  [AR 22.]  In this connection, the ALJ found that the

19 plaintiff was not entirely credible, and the plaintiff does not raise

20 any issues concerning the ALJ's credibility finding.  See Tonapetyan

21 v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)(Because the record

22 supported the ALJ's credibility finding, the ALJ "was free to

23 disregard [the examining physician's] opinion, which was premised on

24 [Tonapetyan's] subjective complaints.")

25      Accordingly, the ALJ did not err in assessing the treating

26 physicians' opinions, and the ALJ provided specific and legitimate

27 reasons based upon substantial evidence in the record for disregarding

28 the opinions of West Central, Dr. Gibson, Dr. Barry and Dr. Wogu.

**The ALJ's step five evaluation**

_____In order to be able to rely upon the testimony of the vocational expert, the hypothetical question posed to her must set out all of the plaintiff's limitations and restrictions.  Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999).  The plaintiff notes that the ALJ found that the plaintiff was limited to "simple, repetitive and low mental stress work requiring simple one to two step instructions with limited ability to related [sic] and interact with the public, supervisors, and co-workers."  (Emphasis in original.)  [Joint Stipulation at 9.] The plaintiff contends that none of the hypothetical questions posed to the vocational expert incorporated all of these findings. Accordingly, the plaintiff argues, the Commissioner failed to meet her step five burden of establishing the existence of work in the national economy which the plaintiff could perform.

The Commissioner concedes that none of the ALJ's hypothetical questions to the vocational experts refer to simple, repetitive, one to two steps.  [AR 493, 529.]  However, the Commissioner argues that the error was harmless because the ALJ properly relied upon the Grids as a framework for finding the plaintiff not disabled.  The Commissioner argues that the limitation to simple repetitive work and limited contact with others is reasonably consistent with the definition of "unskilled work," which is the job category forming the basis of the Grids.  20 C.F.R. Part 404, Appendix 2, Subpart P, section 200.00(b).

The plaintiff counters that the Grids do not apply when the plaintiff is asserting only non-exertional limitations, citing Cooper v. Sullivan, 880 F.2d 1152, 1155 (9th Cir. 1989), which cited 20 C.F.R. Part 404, Appendix 2, Section 200.00(e)(1).

1    However, Section 200.00(e)(1) merely states that "[s]ince the

2  [Grid] rules are predicated on an individual's having an impairment

3  which manifests itself by limitations in meeting the strength

4  requirements of jobs, they _may_ not be fully applicable where the

5  nature of an individual's impairment does not result in such

6  limitations, e.g., certain mental . . . impairments . . . ." (Emphasis

7  added.)  There is, therefore, no absolute proscription against using

8  the Grids as a framework where the impairment is solely non-

9  exertional. On the other hand, where the non-exertional limitations

10  significantly impact the occupational base(s), the Grids may not be

11  applicable.  Tackett, 180 F.3d at 1102.  The ALJ, however, found that

12  the plaintiff's "ability to perform work at all exertional levels was

13  not significantly compromised by his non-exertional limitations," and

14  the ALJ used the rules in Section 204.00, Appendix 2, Subpart P,

15  Regulations No. 4 as a framework for decision-making, concluding that

16  the plaintiff was not disabled.  [AR 23.]

17    The first question then is whether the ALJ was correct in finding

18  that the plaintiff's limitations did not significantly affect the

19  plaintiff's ability to perform work at all exertional levels.  The ALJ

20  was not correct.   The ALJ's very finding that the plaintiff's mental

21  impairments were "severe," suggests that the ALJ essentially conceded

22  that the plaintiff had significant limitations in his ability to

23  understand, remember and carry out simple instructions, or use

24  judgment, or respond appropriately to supervision, co-workers and

25  usual work situations.  20 C.F.R. 416.921.  Thus, the use of the Grids

26  even as a framework was inappropriate without supportive vocational

27  expert testimony.  However, there was vocational expert testimony upon

28  which the ALJ could properly rely.  Relying on such testimony, the ALJ

found that the plaintiff could perform the jobs of icer, D.O.T. 922.687-046, vehicle cleaner, D.O.T. 919.687-014, and advertising distributor, D.O.T. 230.687-010.  [AR 23; <u>see</u> AR 529-30.]  Although the hypothetical question posed to the vocational expert did not include a limitation to simple, repetitive, one to two step instructions [AR 529; <u>see also</u> AR 493], the D.O.T. description of the jobs of icer and advertising distributor both indicate that the plaintiff would be required only to have the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and to "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job."  Therefore, regardless of the ALJ's failure to indicate in his hypothetical question the limitation to simple, repetitive one to two step instruction, the question has been answered.   Any error, therefore, was harmless.  <u>Booz v. Secretary of Health and Human Services</u>, 734 F. 2d 1378, 1380 (9th Cir. 1984).

**CONCLUSION**

After careful consideration of the complaint, Joint Stipulation of the parties, the transcript of the record, and in accordance with the foregoing discussion, the magistrate judge finds that the decision of the Commissioner is supported by substantial evidence and that the Commissioner applied the proper legal standards.

///

///

///

///

///

///

**<u>ORDER</u>**

IT IS ORDERED that judgment be entered in favor of the Commissioner and against the plaintiff.

Dated: August 16, 2005

_____/s/_____
JAMES W. McMAHON
United States Magistrate Judge

_____
_____